U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**2025 MAR -7  AM 9: 25**

CLERK

BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

JENNIFER A.,                              )
                                          )
        Plaintiff,                        )
                                          )
        v.                                )        Case No. 2:24-cv-619
                                          )
LELAND DUDEK,                             )
ACTING COMMISSIONER OF SOCIAL             )
SECURITY,                                 )
                                          )
        Defendant.                        )

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR AN ORDER
REVERSING THE DECISION OF THE COMMISSIONER AND GRANTING
THE COMMISSIONER'S MOTION TO AFFIRM**
(Docs. 8 & 12)

Plaintiff Jennifer A. Allen is a claimant for Supplemental Security Income ("SSI")

payments under the Social Security Act ("SSA") and brings this action pursuant to 42

U.S.C. § 405(g) to reverse the decision of the Social Security Commissioner (the

"Commissioner") that she is not disabled.[1] (Doc. 8.) The Commissioner moves to affirm.

(Doc. 12.) The court took the pending motions under advisement on November 12, 2024.

Plaintiff is represented by Elaine T. Bodurtha, Esq. Special Assistant United States

Attorneys Jason P. Peck and Vernon Norwood represent the Commissioner.

**I.      Procedural History.**

Plaintiff filed her application for SSI on September 6, 2017, alleging disability

---

[1] Disability is defined as the inability "to engage in any substantial gainful activity by reason of
any medically determinable physical or mental impairment which can be expected to result in
death or which has lasted or can be expected to last for a continuous period of not less than
[twelve] months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's "physical or
mental impairment or impairments" must be "of such severity" that the claimant is not only
unable to do any previous work but cannot, considering the claimant's age, education, and work
experience, engage in any other kind of substantial gainful work which exists in the national
economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

beginning February 1, 2017, based on fibromyalgia, degenerative disk disease, celiac disease, post-traumatic stress disorder ("PTSD"), anxiety, major depressive disorder, polyarthralgia, sleep apnea, near syncope, and possible postural orthostatic tachycardia syndrome. (Doc. 5-1 at 233.) After her claim and request for reconsideration was denied, Plaintiff timely filed a request for a hearing, which was held before Administrative Law Judge ("ALJ") Joshua Menard on November 1, 2018. Plaintiff appeared by video-conference and was represented by counsel. She testified, as did Vocational Expert ("VE") Christine Spaulding. ALJ Menard determined that medical expert testimony would be needed and continued the hearing to May 14, 2019, at which time he heard testimony from psychological expert Bill Hughes, medical expert Peter Shosha, and VE Louis Leplant.

On June 5, 2019, ALJ Menard issued an unfavorable decision, which Plaintiff administratively appealed. The Appeals Council denied review on April 7, 2020, and Plaintiff filed a Complaint in this court on May 29, 2020. *Jennifer A. v. Comm'r of Soc. Sec.*, No. 2:20-cv-79 (D. Vt. May 29, 2020). On October 19, 2020, Plaintiff filed a motion to reverse the Commissioner's decision, and on November 13, 2020, the Commissioner filed a consented-to motion to reverse his decision pursuant to sentence four of 42 U.S.C. § 405(g). The court granted the Commissioner's motion on November 16, 2020, and instructed the case to be remanded for further proceedings. On January 15, 2021, the Appeals Council issued an order remanding the case and directing that a subsequent claim for SSI Plaintiff filed on June 2, 2020, be consolidated with the remanded case. The Appeals Council's January 15, 2021 order instructed the ALJ to, on remand, "[f]urther evaluate the severity of the [Plaintiff's] fibromyalgia and De Quervain's tenosynovitis[,]" "[g]ive further consideration to the [Plaintiff's] maximum residual functional capacity [('RFC')] and provide appropriate rationale[,]" and "identify and obtain reasonable explanations for any conflicts between [VE] evidence and information in the [Dictionary of Occupational Titles ('DOT').]" (Doc. 5-1 at 1108.)

After a remand hearing was held on July 22, 2021, ALJ Menard issued an unfavorable decision on August 4, 2021, in which he found Plaintiff's fibromyalgia was

2

not a medically determinable impairment. After his decision became final, Plaintiff again filed a Complaint in this court. On May 25, 2022, Plaintiff filed a motion to reverse the Commissioner's decision, and on July 22, 2022, the Commissioner filed a motion for entry of judgment to reverse his decision and remand for a new hearing. Plaintiff opposed the motion because it only addressed one of several errors she alleged. On August 25, 2022, the court granted the Commissioner's motion. *Jennifer A. v. Comm'r of Soc. Sec.*, No. 2:21-cv-00242 (D. Vt. Aug. 25, 2022). The Appeals Council issued an order on April 17, 2023, remanding the case for a new hearing and assigning it to a new ALJ. The April 17, 2023 Order (the "Remand Order") stated that ALJ Menard's 2021 decision did not comply with the Appeals Council's previous order to evaluate the severity of the Plaintiff's fibromyalgia and instructed the ALJ, on remand, to "[f]urther evaluate the [Plaintiff's] severe and non-severe impairments . . . [s]pecifically considering the severity of the [Plaintiff's] fibromyalgia in accordance with Social Security Ruling 12-2p." (Doc. 5-1 at 1920.)

On February 27, 2024, a hearing was held by video before ALJ Dory Sutker. Plaintiff appeared and was represented by counsel. Both Plaintiff and VE Elizabeth Laflamme testified. On April 1, 2024, ALJ Sutker issued an unfavorable decision, which became the final decision of the Commissioner on June 1, 2024. Plaintiff has appealed that order to this court.

## II.    ALJ Sutker's April 1, 2024 Decision.

Plaintiff was forty years old at the onset date of her alleged disability. The ALJ found that Plaintiff has a limited education and had not engaged in substantial gainful activity since the alleged onset of her disability. She has no past relevant work.

In order to receive SSI under the SSA, a claimant must be disabled on or before the claimant's date last insured. A five-step, sequential-evaluation framework determines whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a [RFC]

3

assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).

"The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at [S]teps [O]ne through [F]our of the sequential five-step framework established in the SSA regulations[.]" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks and citation omitted). At Step Five, "the burden shifts to the Commissioner to show there is other work that [the plaintiff] can perform." *McIntyre*, 758 F.3d at 150 (alterations adopted) (internal quotation marks omitted).

At Step One, ALJ Sutker found that Plaintiff had not engaged in substantial activity since the alleged onset of disability. At Step Two, she concluded that Plaintiff had the following severe impairments: degenerative disk disease, degenerative joint disease, fibromyalgia, carpal tunnel syndrome, obesity, major depressive disorder, and PTSD. In addition to these severe impairments, ALJ Sutker found Plaintiff suffered from obstructive sleep apnea, gastroesophageal reflux disease, irritable bowel syndrome, celiac disease, vision disorder, headaches, and tachycardia, but concluded that these conditions had "no more than a minimal effect on the [Plaintiff's] ability to meet the basic demands of work activity." (Doc. 5-1 at 1930.)

At Step Three, ALJ Sutker determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the Listings. With regard to her non-mental impairments, including obesity, the ALJ concluded that Plaintiff did not meet or equal the severity requirements of Listings 1.15, 1.18, 11.14, or 14.09 because there was no evidence of, among other things, "documented medical need for a walker, bilateral canes, or bilateral crutches or a wheeled and seated mobility device involving the use of both hands[,]" "the requisite disorganization of

4

motor function in two extremities," or "inflammation or deformity in one or more major joints of an upper or a lower extremity with involvement of two or more organs/body systems[.]" *Id.* at 1931.

Regarding Plaintiff's mental impairments, ALJ Sutker found that Plaintiff had moderate limitations in four areas of mental functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing herself. The ALJ concluded that the severity of Plaintiff's mental impairments did not meet or medically equal the criteria of Listings 12.02 and 12.15. In doing so, she found that the "paragraph B" criteria were not satisfied because Plaintiff's mental impairments did not "result in one extreme limitation or two marked limitations in a broad area of functioning." *Id.* at 1932. The ALJ also found that the "paragraph C" criteria of Listings 12.02, 12.04, 12.06, and 12.15 were not satisfied because there was no evidence of a:

> medically documented history of the existence of the disorder over a period of [two] years, and . . . evidence of both: (1) Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the] mental disorder; and (2) Marginal adjustment, that is . . . minimal capacity to adapt to changes in [Plaintiff's] environment or to demands that are not already part of [Plaintiff's] daily life.

*Id.* at 1933-34.

At Step Four, ALJ Sutker determined Plaintiff had the RFC to:

> lift up to twenty pounds occasionally and ten pounds frequently. She can stand and walk for four hours in an eight-hour workday. She can sit for six hours in an eight-hour workday. The [Plaintiff] would need to change position for an aggregate of three to five minutes per hour. The [Plaintiff] cannot climb ladders, ropes[,] or scaffolds. She can frequently balance, and all other postural activities can be performed on an occasional basis. She can frequently finger and feel. The [Plaintiff] can never be exposed to extreme cold or excessive vibrations, such as hand-held power tools. The [Plaintiff] can understand, remember, and carry out simple instructions and perform simple tasks. She needs an environment with no high production norms such as strictly timed tasks or belt work, such as that found on a factory assembly line. The [Plaintiff] can have occasional brief interaction with the general public, and can interact with coworkers and supervisors on

5

routine matters. Within a setting of simple tasks, the [Plaintiff] can adapt to
routine changes. She can maintain concentration, persistence[,] and pace for
two-hour blocks of time throughout the workday, consistent with regularly
scheduled breaks and lunch.

*Id.* at 1934.

At Plaintiff's hearing, ALJ Sutker asked the VE hypothetical questions about the
jobs available to a person of Plaintiff's age and education level, with no past relevant
work, and the same RFC excluding the limitations that Plaintiff can finger and feel
frequently as well as a requirement that she needs to change position for an aggregate of
three to five minutes per hour. The VE opined that this individual could work as a mail
sorter, price marker, and electronics assembler. When asked specifically about sedentary
jobs, the VE testified that work as a document preparer, escort driver, or surveillance
system monitor would also be available. The VE affirmed her answers would not change
if the hypothetical included a limitation that the person needed to change position for an
aggregate of three to five minutes each hour. The ALJ asked if the VE's answers would
change if the person were limited to reaching overhead on an occasional basis or reaching
in all directions on an occasional basis, and the VE answered no to the first limitation but
yes to the latter.

The VE further opined that a person off task for more than ten percent of the
workday or absent from work at least twice a month would be precluded from substantial
gainful activity on a competitive basis. Plaintiff's attorney asked the VE if the jobs she
described in response to the ALJ's hypothetical questions would still be available to a
person "limited to occasional use of the left hand for handling[,]" and the VE answered
"no," stating "[t]hese are in my opinion bilateral required jobs[,]" but answered that a
person limited to frequent use of the left hand could do these jobs. *Id.* at 1851. When
asked if work supervisors generally have "knowledge of dealing with someone with
PTSD[,]" the VE said she did not know the answer. (Doc. 5-1 at 1852.) Plaintiff's
attorney also asked about employers' tolerance for unscheduled breaks, and the VE
answered that unscheduled breaks lasting longer than six minutes and taking place more
than "a couple of times a day" would "[m]ost likely" pose a problem. *Id.* at 1853-54.

6

Considering Plaintiff's age, education, work experience, and RFC, ALJ Sutker determined at Step Five that jobs exist in significant numbers in the national economy which Plaintiff could perform, including mail sorter (approximately 90,000 jobs nationally), price marker (approximately 60,000 jobs nationally), and electronics assembler (approximately 13,000 jobs nationally). As a result, ALJ Sutker concluded Plaintiff was not disabled.

## III.    Conclusions of Law and Analysis.

### A.    Standard of Review.

In reviewing the Commissioner's decision, the court "conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (citation and internal quotation marks omitted). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks omitted).

It is the Commissioner who resolves evidentiary conflicts, and the court "should not substitute its judgment for that of the Commissioner." *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *see also Aponte v. Sec'y, Dep't of Health & Hum. Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984) (noting "genuine conflicts in the medical evidence are for the Secretary to resolve"). Even if the court could draw different conclusions after an independent review of the record, the court must uphold the Commissioner's decision when it is supported by substantial evidence and when the proper legal principles have been applied. *See* 42 U.S.C. § 405(g); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.").

The court does not defer to the Commissioner's decision "[w]here an error of law has been made that might have affected the disposition of the case[.]" *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted) (first alteration in

7

original). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision. *" Jason F. v. O'Malley*, 2024 WL 1756547, at *4 (D. Vt. Apr. 23, 2024) (internal quotation marks omitted) (quoting *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009)).

## B.    Whether the ALJ Legally Erred in Evaluating Plaintiff's Fibromyalgia.

Although ALJ Sutker determined Plaintiff's fibromyalgia was a severe impairment, Plaintiff argues that the ALJ's analysis of her fibromyalgia symptoms was inconsistent with Social Security Ruling 12-2p ("SSR 12-2p") and thus violated the Remand Order's directive to "consider[] the severity of the [Plaintiff's] fibromyalgia in accordance with Social Security Ruling 12-2p." (Doc. 5-1 at 1920.) According to Plaintiff, the ALJ failed to properly include her fibromyalgia symptoms in her RFC finding and focused on imaging studies and diagnostic testing, which contravenes case law stating that fibromyalgia impairments may not manifest in test results. The Commissioner counters that the ALJ's evaluation of Plaintiff's fibromyalgia was supported by substantial evidence.

An ALJ "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. § 404.977(b). "The failure of an ALJ to abide by the directives in an Appeals Council remand order constitutes legal error requiring remand." *White v. Saul*, 414 F. Supp. 3d 377, 381 (W.D.N.Y. 2019); *see also Susan B. v. Comm'r of Soc. Sec.*, 515 F. Supp. 3d 225, 234 (D. Vt. 2021) (same); *Ellis v. Colvin*, 29 F. Supp. 3d 288, 299 (W.D.N.Y. 2014) (same). A remand order, however, does not necessarily require a different disability determination. *See Hayden B. v. Comm'r of Soc. Sec.*, 2:23-cv-197 (D. Vt. Oct. 17, 2024) (affirming ALJ's second decision denying disability benefits after this court remanded the case).

SSR 12-2p describes the evidence needed to establish fibromyalgia as a medically determinable impairment. SSR 12-2p, 2012 WL 3104869 (July 25, 2012). It states that "[b]ecause the symptoms and signs of [fibromyalgia] may vary in severity over time and

8

may even be absent on some days, it is important that the medical source who conducts the [consultative examination] has access to longitudinal information about the person." *Id.* at *5. Regarding the RFC assessment, it explains that "[f]or a person with [fibromyalgia], we will consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'" *Id.* at *6. The Second Circuit has recognized "that 'there are no objective tests which can conclusively confirm the disease.'" *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d. Cir. 2003) (quoting *Preston v. Sec. of Health and Hum. Servs.*, 854 F.2d 815, 818 (6th Cir.1988)). Courts in the Second Circuit have thus held that "denying a fibromyalgia-claimant's claim of disability based in part on a perceived lack of objective evidence is reversible error." *Campbell v. Colvin*, 2015 WL 73763, at *6 (N.D.N.Y. Jan. 6, 2015); *see also John P. v. Comm'r of Soc. Sec.*, 2023 WL 5738448, at *7 (W.D.N.Y. Sept. 5, 2023) (remanding where ALJ "erroneously placed undue emphasis on the lack of objective evidence in contravention of the guidance provided by the regulations").

Plaintiff was diagnosed with fibromyalgia on January 4, 2012, by rheumatologist Douglas Dier, M.D., who noted "[d]iffuse tenderness . . . at the lateral epicondyles posterior neck paraspinal musculature over the greater trochanters and medial knees" as well as subjective symptoms of "[p]ersistent discomfort" and "[s]leeping poorly[.]" (Doc. 5-1 at 2483.) He prescribed Plaintiff trazodone in addition to the naproxen and Valium she was taking. During a March 30, 2015 appointment, Plaintiff reported to Dr. Dier "persistent generalized aching and sleeping poorly at night." *Id.* at 2484. She stated she had started taking amitriptyline and was experiencing short-term memory difficulties as a side effect. She refused another provider's suggestion to increase the dose. She also reported receiving a lumbar epidural injection that had increased her pain. Dr. Dier assessed Plaintiff as experiencing "[o]ngoing chronic pain" with "[n]o evidence for underlying inflammatory disease" and recommended that she increase her amitriptyline dose and "remain as physically active as possible despite the discomfort." *Id.*

A September 27, 2016 medical source statement from Arabella Bull-Stewart, DO, Plaintiff's treating pain management doctor, stated that Plaintiff had eighteen "positive

trigger points characteristic of fibromyalgia[.]" *Id.* at 2488. A January 11, 2017 treatment
note from Susan Dumas, APRN, Plaintiff's primary care provider, noted Plaintiff's
fibromyalgia diagnosis and indicated that on that day she had "18/18 positive tender
points." *Id.* at 528. ALJ Sutker acknowledged Plaintiff's fibromyalgia diagnoses but
noted that "physical examinations performed since the application date have not revealed
the number or location of trigger points consistent with that impairment[.]" *Id.* at 1938.
Despite this observation, ALJ Sutker factored Plaintiff's fibromyalgia into her RFC by
limiting her to "stand and walk for four hours in an eight-hour workday with the ability to
change position for an[] aggregate of three to five minutes per hour" because of her
"degenerative dis[k] disease, degenerative joint disease and fibromyalgia[.]" (Doc. 5-1 at
1940-41.)

On July 13, 2018, Dr. Joseph Phillips, M.D., Ph.D., evaluated Plaintiff to address
her chronic pain. He noted that Plaintiff presented with "pain in the neck with
predominantly radiation into the left arm as well as low back pain with radiation into the
buttock and posterior thigh." *Id.* at 780. Upon examination, Dr. Phillips found Plaintiff
had "no hyperreflexia, no Hoffman's reflexes[,]" "full strength in her shoulders, biceps,
triceps, and hands and grips[,]" "no loss of strength" in the lower extremities, and
"[s]ensation . . . diminished subjectively on the left arm compared with the right." *Id.* at
780. Dr. Phillips treated Plaintiff on September 18, 2018, and concluded that additional
testing was needed to assess the type of surgery that would be helpful for her.

Dr. Phillips performed a "C4/5, C5/6, C6/7 anterior discectomy, osteophyte
removal, allograft fusion, and interbody fixation with Chesapeake" on Plaintiff in
October 2019. *Id.* at 24. Notes from a postoperative visit on February 25, 2020 state that
"[o]ne of [Plaintiff's] biggest preoperative complaints was headaches, particularly on the
left side, and she says that for the most part that's gone[.]" *Id.* at 1491. Plaintiff continued
to have issues with neck pain, although she "overall seem[ed] to have had or at least is
having improvements[.]" *Id.* The ALJ's decision noted this improvement but
acknowledged "the [Plaintiff's] musculoskeletal symptoms have not completely
resolved" after various treatments. (Doc. 5-1 at 1938.)

10

On September 24, 2020, Plaintiff underwent a consultative exam by Tarryn Schneider, PA-C, as part of the determination of her disability claim. Plaintiff reported that due to her fibromyalgia, "her entire body hurts her on a daily basis." *Id.* at 1567. She stated that she could not wear a bra or clothes with tags on them because they caused her pain, wearing her hair up gave her a headache, rolling over at night caused her "extreme pain[,]" and she was taking cyclobenzaprine and melatonin to sleep at night, although the medication "d[id] not help her to stay asleep for very long." *Id.* at 1567. Upon examination, PA Schneider described Plaintiff as "pleasant" and "in mild distress." *Id.* at 1569. She observed Plaintiff "ambulate[d] with a normal heel-to-toe gait[,]" was "slow to get on and off the examination table[,]" was "able to perform fine and gross motor tasks[,]" and was "not able to reproduce fatigue of motor function on repetitive activity." *Id.* at 1570. Examination of Plaintiff's spine revealed "tenderness to palpation of the cervical spinous processes and paraspinal musculature as well as lumbar spinous processes and paraspinal musculature." *Id.* at 1570. Plaintiff exhibited full range of motion of her upper extremity and lower extremity joints, with pain noted in the shoulder and low back with hip range of motion tests. Strength of her upper and lower extremity joints was generally 5/5, except for her triceps, wrist flexion, wrist extension, and hip flexion, which PA Schneider rated 4/5. PA Schneider also noted "tenderness to palpation of both the left and right trapezius muscle and into the shoulder" as well as the abdomen. (Doc. 5-1 at 1570.)

State agency medical consultant Dr. Leslie Abramson reviewed the medical evidence for the period from June 2, 2020, to October 14, 2020 and concluded that "due to spine pathology[,] fibromyalgia[,] and polyarthralgias, with chronic pain, fatigue, and other symptomatology as noted, exacerbated by obesity," Plaintiff was limited to lifting or carrying twenty pounds occasionally and ten pounds frequently, walking and standing for six hours, and sitting for six hours in an eight-hour workday. *Id.* at 1099.

Plaintiff treated with Dr. Bull-Stewart throughout the disability determination period, although she saw Dr. Bull-Stewart on November 16, 2020, for the first time since May 23, 2018. Plaintiff reported that her surgery had relieved her severe headaches, but it

11

did not relieve her neck pain and she continued to experience "tightness throughout the neck with pain and numbness to bilateral arms." *Id.* at 1585. Upon examination, Dr. Bull-Stewart noted a steady gait, "4/5 in bilateral grip, 5/5 through bilateral triceps, triceps, and deltoids[,]" and "[s]ensation . . . diminished to pinprick throughout the left biceps, deltoid, and triceps, as well as [first dorsal interosseous muscle]." *Id.* at 1587. Dr. Bull-Stewart's treatment notes document Plaintiff's "visual analog pain rating" at more than two dozen visits between 2017 and 2023, during which Plaintiff frequently rated her pain a seven out of ten in various parts of her body. *See, e.g., id.* at 2212. In a medical source statement dated September 12, 2023, Dr. Bull-Stewart wrote that Plaintiff's fibromyalgia caused her to suffer from whole body muscle pain, weakness, and brain fog that limited her mobility and activities.

In explaining why she found the limiting effects of Plaintiff's symptoms were less severe than alleged by Plaintiff, ALJ Sutker noted that "[i]maging studies and diagnostic testing has generally revealed relatively minimal abnormalities" and cited "the absence of electrodiagnostic testing revealing lumbar radiculopathy" as a reason for not finding more restrictive limitations based on Plaintiff's degenerative disk disease, degenerative joint disease, and fibromyalgia. *Id.* at 1936, 1941. The ALJ also stated that "[p]hysical examinations performed since the application date have not revealed abnormalities consistent with an inability to engage in substantial gainful activity." (Doc. 5-1 at 1937.) Citing *Green-Younger*, Plaintiff argues that such objective findings "have no bearing on the severity of fibromyalgia and do nothing to justify the ALJ's conclusion that [Plaintiff's] symptoms of fibromyalgia are not consistent with the evidence." (Doc. 8 at 7.)

*Green-Younger* holds that an ALJ errs by *requiring* "'objective' evidence" to find disability based on fibromyalgia, "a disease that eludes such measurement." 335 F.3d at 108. "[T]his does not preclude the ALJ from considering a lack of objective evidence in connection with h[er] assessment of a [plaintiff's] fibromyalgia." *Serena B. v. Comm'r of Soc. Sec.*, 2024 WL 3822808, at *6 (W.D.N.Y. Aug. 15, 2024). Courts have found no legal error where an ALJ considered objective evidence as well as subjective complaints

when assessing the RFC of a plaintiff with fibromyalgia symptoms. *See, e.g., Angelis G. v. Kijakazi*, 2023 WL 4540437, at *6 (D. Conn. July 14, 2023) (finding no error because ALJ "'followed the steps set forth in' [SSR] 12-2p by 'properly consider[ing] *more* than just the objective evidence.'") (emphasis and alteration in original) (quoting *Christine M.R. v. Saul*, 2021 WL 129415, at *20 (D. Conn. Jan. 14, 2021)); *Lynn C. v. Comm'r of Soc. Sec.*, 2023 WL 4082351, at *6 (W.D.N.Y. June 20, 2023) (finding no error because "the ALJ did not require objective medical evidence of fibromyalgia to corroborate [plaintiff's] complaints; instead, he looked to other evidence to evaluate whether those complaints accurately related her condition").

In this case, the ALJ followed the Remand Order's directive to evaluate the severity of Plaintiff's fibromyalgia and deemed it a severe impairment. ALJ Sutker also factored Plaintiff's fibromyalgia into her RFC by limiting Plaintiff "to stand and walk for four hours in an eight-hour workday with the ability to change position for an[] aggregate of three to five minutes per hour." (Doc. 5-1 at 1940-41.) Insofar as the ALJ found certain fibromyalgia symptoms less disabling than Plaintiff claimed, she considered the fact that Plaintiff presented full or mildly reduced strength and intact sensation over the course of "multiple examinations[.]" *Id.* at 1941. For example, the ALJ cited treatment notes spanning years showing Plaintiff had full range of motion and mildly reduced or full strength, and no issue with gait. *See, e.g., id.* at 1658-59 (March 30, 2021 treatment notes describing Plaintiff's strength as "5/5 in bilateral upper and lower extremities" and tandem gait as "intact"); *id.* at 626 (October 12, 2017 treatment notes describing Plaintiff as having "full range of motion of the elbow, wrist, and digits"). This accords with SSR 12-2P's directive that an ALJ "consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane[.]" 2012 WL 3104869, at *6.

Consistent with SSR 12-2P, the ALJ also considered "all of the evidence in the case record," including Plaintiff's improvement after surgery and other treatments and treatment notes describing Plaintiff as being in no apparent or acute distress, which the ALJ concluded undermined Plaintiff's subjective complaints of pain. *Id.* at *5 (explaining that "[i]f objective medical evidence does not substantiate" plaintiff's symptoms, the ALJ

13

considers "all of the evidence in the case record, including . . . medications or other treatments the person uses, or has used, to alleviate symptoms . . . and statements by other people about the person's symptoms"). Although Plaintiff disagrees with the ALJ's conclusions regarding the treatment notes, "this is not a case where the ALJ discounted Plaintiff's complaints of pain from her fibromyalgia solely based on objective medical evidence." *Serena B.*, 2024 WL 3822808, at *7. ALJ Sutker therefore did not commit reversible legal error in evaluating Plaintiff's fibromyalgia symptoms.

## C. Whether Substantial Evidence Supports the ALJ's Conclusion that Dr. Bull-Stewart's Opinions Regarding Plaintiff's Physical Limitations Were Largely Unpersuasive.

Plaintiff argues that the ALJ erred in finding Dr. Bull-Stewart's opinions not well supported or consistent with other evidence in the record. She contends that if weighed properly, Dr. Bull-Stewart's findings indicate that Plaintiff's "ability to perform the full range of sedentary work is significantly eroded, such that she is disabled[.]" (Doc. 8 at 10.) Plaintiff does not contest that it is the ALJ's sole prerogative to make the disability determination. *See Nora A. v. Comm'r of Soc. Sec.*, 551 F. Supp. 3d 85, 93 (W.D.N.Y. 2021) ("It is well-established that 'the ultimate issue of disability is reserved for the Commissioner.'") (quoting *Taylor v. Barnhart*, 83 F. App'x 347, 349 (2d Cir. 2003)).

"When making a determination of disability, an ALJ must consider all of the available evidence in the individual's case record, including the opinions of medical sources." *Karen S. v. Comm'r of Soc. Sec.*, 2020 WL 4670911, at *13 (D. Vt. Aug. 11, 2020) (internal quotation marks, alteration, and citation omitted). An ALJ must articulate *how* they considered medical opinions and prior administrative findings, as well as *how persuasive* they found them. 20 C.F.R. §§ 404.1520c(a)-(b), 416.920c(a)-(b).

An ALJ "will not defer or give any specific evidentiary weight . . . to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." *Id.* §§ 404.1520c(a), 416.920c(a). Instead, an ALJ must consider each medical opinion or prior administrative finding in the record and evaluate its persuasiveness in accordance with five factors: (1) supportability; (2) consistency;

14

(3) relationship with the claimant (including: (i) length of treatment relationship, (ii) frequency of examinations, (iii) purpose of treatment relationship, (iv) extent of treatment relationship, (v) examining relationship); (4) specialization; and (5) other factors that tend to support or contradict a medical opinion or prior administrative medical finding. *See id.* §§ 404.1520c(c), 416.920c(c).

The factors of supportability and consistency "are the most important factors [an ALJ] consider[s]" when determining the persuasiveness of a medical opinion. *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). An ALJ must therefore articulate how he or she considered the supportability and consistency of a medical opinion and may, but need not, address the remaining three factors. *Id.* Supportability refers to "how well a medical source supported and explained [his or her] opinion[,]" and "consistency is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record." *Vellone ex rel. Vellone v. Saul*, 2021 WL 319354, at \*6 (S.D.N.Y. Jan. 29, 2021), *report and recommendation adopted*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021). "[W]hen the record contains competing medical opinions, it is the role of the Commissioner to resolve such conflicts." *Diana C. v. Comm'r of Soc. Sec.*, 2022 WL 1912397, at \*7 (S.D.N.Y. Apr. 11, 2022) (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)).

In addition to treating Plaintiff during the relevant period, Dr. Bull-Stewart completed two medical source statements between the onset date of Plaintiff's alleged disability and the date of ALJ Sutker's decision.[2] On September 19, 2018, Dr. Bull-Stewart opined that Plaintiff could lift and carry up to ten pounds occasionally due to her "pain, weakness[,] and numbness" and could sit or stand for ten to fifteen minutes at a time and walk for five to ten minutes at a time due to "low back [and] leg pain and cramping[.]" (Doc. 5-1 at 784-85.) She stated Plaintiff could reach overhead and handle

---

[2] Dr. Bull-Stewart prepared a third medical source statement dated September 27, 2016, which the ALJ found "unpersuasive as it was prepared prior to the alleged onset date and the application date, and it does not address the [Plaintiff's] impairments or functioning during the relevant period at issue." (Doc. 5-1 at 1943.) Plaintiff mentions the September 27, 2016 statement but does not contest the ALJ's reason for not considering it.

frequently, finger and feel occasionally, and never push or pull with the right hand, and that she could not perform any of these activities with the left hand except for occasional overhead reaching. Dr. Bull-Stewart opined that Plaintiff could operate foot controls frequently with her right foot and occasionally with her left foot; occasionally climb stairs and ramps, balance, stoop, and crouch; and never climb ladders or scaffolds, kneel, or crawl. She found that Plaintiff could never tolerate unprotected heights; moving mechanical parts; humidity and wetness; dust, odors, fumes, and pulmonary irritants; extreme cold or heat; or vibrations and could occasionally tolerate operating a motor vehicle. She indicated that Plaintiff could not "walk a block at a reasonable pace on rough or uneven surfaces[.]" *Id.* at 788-89.

In her medical source statement dated September 12, 2023, Dr. Bull-Stewart identified diagnoses of fibromyalgia, lumbar spondylosis and left radiculopathy, left pain with labral tears and cam deformity, cervical spondylosis and stenosis, and shoulder pain. She opined that Plaintiff could lift or carry one pound frequently and less than ten pounds occasionally and stand or walk for five to ten minutes at a time due to "pain and weakness." *Id.* at 2409. Regarding how long Plaintiff could stand or walk over an eight-hour day, Dr. Bull-Stewart did not provide a number but noted that Plaintiff would be "constantly having to change position due to pain." *Id.* In response to the question "Does [Plaintiff] continue to suffer from fibromyalgia, and if so, does this disorder contribute to her functional imitations?" Dr. Bull-Stewart answered, "Yes. Her whole body muscle pain and weakness with foggy-headedness ('Brain fog') impact and limit her mobility, activities[,] and quality of life." *Id.* at 2408. She further opined that Plaintiff could occasionally reach overhead and in front with both hands, occasionally handle or finger with her right hand, and never handle or finger with her left hand due to "pain, weakness[,] and numbness[.]" *Id.* at 2409. Dr. Bull-Stewart stated Plaintiff "would likely miss work [ninety to ninety-five percent] of the time" and noted headaches and knee pain as "additional limitations that might interfere with [Plaintiff's] ability to work." (Doc. 5-1 at 2410.)

16

2:24-cv-00619-cr   Document 14   Filed 03/07/25   Page 17 of 28

ALJ Sutker found Dr. Bull-Stewart's opinions "to be largely unpersuasive" because they "are not supported by significant narrative explanation or description of clinical or diagnostic findings." *Id.* at 1943. The ALJ acknowledged that Dr. Bull-Stewart referenced pain, weakness, numbness, cramping, and brain fog in support of Plaintiff's limitations but concluded that "medical records in evidence do not support the extreme limitations assessed by Dr. Bull-Stewart, and findings on imaging studies, diagnostic testing, and physical and mental status examinations are inconsistent with Dr. Bull-Stewart's opinion." *Id.* ALJ Sutker noted that despite reports of incapacitating pain, Plaintiff was described as being "in no distress or no acute/apparent distress . . . on numerous examinations," findings of numbness were not consistent across different examinations, "electrodiagnostic testing revealed only mild carpal tunnel syndrome," and Plaintiff was able to perform fine and gross motor tasks in her consultative examination with PA Schneider.[3] *Id.* She further noted that, "inconsistent with Dr. Bull-Stewart's opinion[,]" Plaintiff's strength was described as mildly reduced or normal in multiple examinations and that the results of Plaintiff's mental status examinations, which generally described average intellectual function and only mildly impaired memory, were "inconsistent with incapacitating brain fog." *Id.*

Plaintiff argues that the ALJ cherry-picked the medical record for examples of improved strength or sensation, ignoring that fibromyalgia symptoms "can wax and wane so that a person may have 'bad days and good days[,]'" (Doc. 8 at 9), and inappropriately relied on objective evidence to find inconsistencies between the record and Dr. Bull-Stewart's opinions. *J.B. v. Saul*, 2022 WL 4103017, at *7 (D. Vt. Feb. 2, 2022) (quoting SSR 12-2p); *see also John P.*, 2023 WL 5738448 at *7 (explaining that "[w]hen determining an RFC based on fibromyalgia, the ALJ is not entitled to rely solely on objective evidence—or lack thereof—related to fibromyalgia") (alteration in original) (internal quotation marks omitted) (quoting *Ian S. v. Comm'r of Soc. Sec.*, 2021 WL

---

[3] Although the ALJ refers to a "consultative examination performed in October of 2022," the exhibit she cites corresponds to PA Schneider's Consultative Exam Medical Report, which was dictated on October 9, 2020. (Doc. 5-1 at 1941.)

17

3292203, at \*3 (W.D.N.Y. Aug. 2, 2021)). While "it is error for an ALJ to doubt the credibility of claimant with fibromyalgia based solely on a 'relative lack of physical abnormalities' or normal physical exam results[,]" an ALJ does not necessarily err by "referenc[ing] exam findings . . . in the context of evaluating the severity of [p]laintiff's symptoms." *Darnise C. v. Comm'r of Soc. Sec.*, 2022 WL 896762, at \*9, \*11 (W.D.N.Y. Mar. 28, 2022).

In this case, the ALJ did not solely rely on objective evidence such as diagnostic testing and physical examinations when she discounted Dr. Bull-Stewart's opinions, nor did she cherry-pick the record. Because an ALJ is permitted to discount a medical opinion if "it is brief, conclusory, and inadequately supported by clinical findings[,]" ALJ Sutker was permitted to find Dr. Bull-Stewart's opinions less persuasive because of their lack of explanation and because they suggested extreme limitations not endorsed by Plaintiff's other treatment providers. *Carpenter v. Astrue*, 2011 WL 3951623, at \*5 (D. Vt. Sept. 7, 2011). Other than referencing Plaintiff's subjective complaints, Dr. Bull-Stewart's opinions do not explain her rationale for concluding that Plaintiff could *never* handle or finger with her left hand and that she would miss work ninety to ninety-five percent of the time.

As Plaintiff points out, the record also includes "extensive clinical notes" from Dr. Bull-Stewart that document Plaintiff's self-reported pain levels at various visits over multiple years. (Doc 8. at 12.) However, ALJ Sutker found Plaintiff's subjective reports of pain not entirely credible because despite Plaintiff's complaints of "incapacitating pain[,]" the treatment providers who examined her almost always described her as being in "no distress or no acute/apparent distress[.]"[4] (Doc. 5-1 at 1943.) *See Pezzo v. Kijakazi*, 2022 WL 2315635, at \*6 (D. Conn. June 28, 2022) (finding RFC supported by substantial evidence where "the ALJ observed that despite [p]laintiff's allegations of severe pain and other symptoms, [p]laintiff was consistently described by his treating professionals as in

---

[4] *See, e.g.,* Doc. 5-1 at 19 (describing Plaintiff as in "no acute distress" on November 13, 2019); *id.* at 1658 (describing Plaintiff as in "no distress" on March 30, 2021); *id.* at 2399 (describing Plaintiff as in "no acute distress" on August 5, 2023).

'no distress,' 'no acute distress[,]' or 'no apparent distress' throughout the medical records"); *Valdez v. Colvin*, 232 F. Supp. 3d 543, 557 (S.D.N.Y. 2017) (holding that substantial evidence supported ALJ's adverse credibility finding where "as the ALJ noted, doctors consistently found [the plaintiff] to be in no acute or apparent distress at her appointments" despite the plaintiff's complaints of pain "everywhere") (internal quotation marks and citation omitted); *McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("[The plaintiff's] complaints of disabling pain are inconsistent with repeated observations from treating and consultative physicians that [plaintiff] was not in acute pain or distress.").

Generally, "an ALJ [is not] required to accept a [plaintiff's] statements about the severity and disabling effects of [his or] her fibromyalgia where there is conflicting evidence[.]" *Darnise C.*, 2022 WL 896762, at \*10. Because the ALJ "has the opportunity to observe witnesses' demeanor, candor, fairness, intelligence[,] and manner of testifying . . . credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are patently unreasonable." *Christina J. v. Comm'r of Soc. Sec.*, 695 F. Supp. 3d 357, 362 (W.D.N.Y. 2023) (internal quotation marks and citations omitted).

Citing *Estrella v. Berryhill*, 925 F.3d 90 (2d Cir. 2019) and *Combs v. Berryhill*, 878 F.3d 642 (8th Circ. 2017), Plaintiff argues that the ALJ's reliance on notations about Plaintiff's distress level was flawed because, without more, such notations "are entitled to little weight." (Doc. 8 at 9.) *Estrella* involved the ALJ's improper reliance on Global Assessment of Functioning scores, which are not at issue here, to accord less weight to a doctor's opinion about the plaintiff's mental functioning. 925 F.3d at 97. In *Combs*, the Eight Circuit held that the ALJ erred by finding the plaintiff's "subjective complaints of pain not entirely credible in large part based on her treating physicians' notations that she was in 'no acute distress' and 'had normal movement of all extremities'" after the Commissioner conceded in her brief that the term "no acute distress" was "not of particular significance" with regard to "a chronic condition such as [Plaintiff's] rheumatoid arthritis." 878 F.3d at 645, 647 (alterations incorporated) (internal quotation

19

marks omitted). Although fibromyalgia is also a chronic condition, the Commissioner has not made a similar concession in this case.

Because a diagnosis of fibromyalgia is often highly reliant on a claimant's subjective complaints, a credibility assessment is common. *See Christina J.*, 695 F. Supp. 3d at 365 (finding no error in ALJ's credibility assessment because it "did not rely solely on a lack of objective medical evidence" but also considered the plaintiff's activities of daily living). ALJ Sutker's credibility finding was supported by substantial evidence in the record and thus cannot be disturbed. *Martes v. Comm'r of Soc. Sec.*, 344 F. Supp. 3d 750, 760 (S.D.N.Y 2018) ("Here, because substantial evidence supports the ALJ's credibility determination, it must be upheld.")

The ALJ also found Dr. Bull-Stewart's opinion less persuasive based on the inconsistencies between her opinion that Plaintiff was impaired by brain fog when multiple examinations found her to be at most mildly impaired in her memory and presenting as alert and oriented with logical thoughts. Although Dr. Bull-Stewart did not opine that Plaintiff was debilitated by brain fog alone, she listed it as one of several symptoms impacting Plaintiff's ability to function. As the ALJ noted, this opinion was inconsistent with record evidence that does not show any significant mental impairments.

Plaintiff notes that "the only medical opinion ALJ Sutker cited which is contrary to those of Dr. Bull[-]Stewart" came from Dr. Abramson, who only reviewed about four months of Plaintiff's medical records. (Doc. 8 at 15) (emphasis in original). This is inaccurate. Dr. Phillips provided a detailed analysis of Plaintiff's MRIs and generally found they did not support Plaintiff's symptoms. PA Schneider also examined Plaintiff and found she had normal gait, was able to perform fine and gross motor tasks, and had full range of motion in upper and lower extremities with some pain noted, but not full body pain as described by Dr. Bull-Stewart. Moreover, the ALJ accounted for the limited nature of Dr. Abramson's review by noting that the opinion "was based on information contained in the record at the time of the state agency initial determination in this case" and finding "additional limitations" based on the "significant amount of additional medical evidence received in the course of developing the [Plaintiff's] case for review at

20

the hearing." (Doc. 5-1 at 1940.) *Cf. Camille v. Colvin*, 652 F. App'x 25, 28, 28 n.4 (2d. Cir. 2016) (summary order) (finding ALJ did not err in giving "great weight" to opinion of state agency consultant even though record contained subsequent evidence that consultant did not have opportunity to review) (internal quotation marks omitted).

"While there may be evidence in the record that supports [the p]laintiff's contentions as to the severity of her symptoms," the ALJ's determination must be upheld so long as substantial evidence supports it, as "it is not the proper role of this [c]ourt to reweigh the evidence." *Sarah S. v. Kijakazi*, 2022 WL 913095, at *4 (N.D.N.Y. Mar. 29, 2022).[5]

Because the ALJ considered the longitudinal record and found Dr. Bull-Stewart's opinions largely unpersuasive based not only on objective findings but also treatment notes, the contrasting opinion of a state agency consultant, the objective test results, and her assessment of the Plaintiff's credibility, her determination is supported by substantial evidence and must be affirmed. *See Anysha M. v. Comm'r of Soc. Sec.*, 2020 WL 1955326, at *5 (N.D.N.Y. Apr. 23, 2020) (finding ALJ's decision supported by substantial evidence where her analysis considered lack of objective findings and other evidence, such as plaintiff's daily activities, in assessing plaintiff's fibromyalgia and other severe impairments).

**D.    Whether Substantial Evidence Supports ALJ Sutker's Conclusion that Dr. Vail's Opinion Was Not Fully Persuasive.**

Plaintiff asserts that ALJ Sutker erred in finding not fully persuasive the opinions of Aleta Vail, Ph.D., which indicated that Plaintiff "is unable to work in the competitive work environment without special accommodations." (Doc. 8 at 15) (emphasis in original). The Commissioner argues that the ALJ "supportably determined" that Dr.

---

[5] Plaintiff notes a "September 2022 lumbar MRI showing moderate to severe neuroforaminal narrowing and dis[k] appearing to abut the exiting nerve root," and "a left hip MRI demonstrating labral tear and cam morphology"; however, she does not cite a doctor's opinion finding these conditions contributed to her pain and only claims these "studies are consistent with Dr. Bull-Stewart's diagnoses of spondylosis and other disorders[.]" (Doc. 8 at 14-15.)

Vail's opinion was inconsistent with her treatment notes and not well explained or supported by the evidence. (Doc. 12 at 14.)

Dr. Vail performed a single-session psychological evaluation of Plaintiff on December 18, 2020, via Zoom in response to a referral from Plaintiff's attorney, in which Plaintiff was interviewed in her attorney's office for evidence to support her disability application. This evaluation took place prior to ALJ Sutker's decision. Dr. Vail noted that Plaintiff was "open and cooperative during the assessment[,]" became "visibly tired after two hours of testing[,]" and "seemed increasingly dejected, though she maintained her performance level." (Doc. 5-1 at 1607.) She found Plaintiff's responses to be "valid, reflective of her history" overall, noting that though certain validity measures "suggested that [Plaintiff] responded in an invalid response pattern of over-reporting of symptoms . . . this response pattern is not uncommon in people with severe histories of abuse and neglect." *Id.* at 1610. "In general, [Plaintiff's] cognitive functioning in terms of memory, visual/spatial processing, and language functions [were] in the average range." *Id.* at 1612. The doctor noted that Plaintiff's responses to the Trauma Symptom Inventory "were considered valid, yet reflective of a presentation of severe symptoms[,]" and "indicate severe depression and anxiety, intrusive experiences of flashbacks and upsetting memories, and her attempt to avoid these experiences by suppressing or eliminating painful thoughts and memories." *Id.* at 1611.

Dr. Vail opined that overall, Plaintiff "would require a job atmosphere in which there was sensitivity to her needs for emotional safety, and . . . without that, she would not likely be able to sustain focus and regular attendance at work. Sadly, these supportive work environments are not generally available to people with low skills and a sporadic work history." *Id.* at 1613-14. She provided the following answers to questions from Plaintiff's attorney:

> 1) Will [Plaintiff's] psychiatric disorders prevent her from working . . .
> a) so long as she had a simple, routine, repetitive job?
> Based on [Plaintiff]'s work and educational history, she would be able to perform only simple, routine, repetitive jobs. Though [Plaintiff]'s average intelligence would have improved her ability to work at jobs with more

responsibility, her history of trauma and psychiatric symptoms have been preventative.

b) with no more than occasional and brief superficial interaction with the public?

Interaction with the public could become problematic, as her need to have control over who she interacts with would not be available to her, causing hypervigilance and withdrawal.

c) no more than frequent interaction with supervisors?

The success of interactions with supervisors would largely depend upon the approach of the supervisors and their understandings about dealing with someone with PTSD. If that understanding was missing, it is unlikely that [Plaintiff] would be able to tolerate their interactions as they could be experienced as intrusive and trigger reactivity on [Plaintiff]'s part.

d) no more than frequent interaction with coworkers that she is familiar with?

This would largely depend on with whom she was working and the sense of safety that she experienced in their presence. If the work relationships became problematic for [Plaintiff], it is unlikely that she could tolerate continual exposure.

*Id.* at 1613.

ALJ Sutker found Dr. Vail's opinion "not fully persuasive" in part because Dr. Vail "examined the [Plaintiff] on only one occasion" and "through attorney referral and in connection with an effort to generate evidence for the current appeal [of Plaintiff's disability claim]." (Doc. 5-1 at 1941.) The ALJ found that Dr. Vail's opinion was consistent with mental status examinations in the record but "did not describe specific work-related functional limitations with respect to the [Plaintiff's] ability to interact with the public" because it "used the undefined term 'problematic'[] without assessing specific work-related functional limitations to give meaning to that term" and "described characteristics of supervisors, coworkers and work environments, rather than assessing specific work-related functional limitations or abilities of the [Plaintiff]." *Id.* The ALJ further explained that

[t]o the extent that Dr. Vail's opinion implies more restrictive limitations than those included in the determined [RFC], it is inconsistent with other significant evidence of record. In particular, on multiple

> examinations the [Plaintiff] was described as cooperative, pleasant, alert[,]
> and/or oriented with good eye contact, an ability to follow simple
> commands, intact to moderately impaired short-term memory, intact to
> mildly impaired long-term memory, average intelligence, logical/normal
> thoughts, and fair/good insight and judgment.

*Id.*

The ALJ also found the opinion of Jemsa Sheriff, LCMHC, Plaintiff's treating mental health provider, "largely unpersuasive." *Id.* at 1944. Ms. Sheriff completed a medical source statement dated June 24, 2021, in which she confirmed that she had been treating Plaintiff since 2018. In response to questions about how Plaintiff's disorders impacted her ability to understand, remember, and apply information; interact with others; maintain concentration, persistence, or pace; and regulate her emotions, control her behavior, and maintain her well-being, Ms. Sheriff answered that the impact was unpredictable and would vary depending on, among other things, whether Plaintiff's PTSD symptoms were triggered. With regard to Plaintiff's ability to "interact with others independently, appropriately, and effectively on a sustained basis[,]" Ms. Sheriff noted Plaintiff's "mistrust and suspiciousness of others" and "difficulty in establishing appropriate boundaries" and opined that her limitation could vary from mild to marked or extreme "on any given day." *Id.* at 1740 (emphasis in original). Ms. Sheriff concluded that Plaintiff was "not currently capable of full-time work . . . due to the unpredictability of PTSD triggers, depression [and] anxiety levels, feelings of unsafety, [and] suspiciousness of others." *Id.* at 1744.

The ALJ found this opinion unpersuasive because it was "largely unsupported by specific work-related functional limitations or abilities[,]" described "overly broad" limitations, and Ms. Sheriff's treatment notes were "inconsistent with [the] unpredictable, marked[,] or extreme functional limitations" she assessed in her medical source statement. (Doc. 5-1 at 1944.) For example, Ms. Sheriff's treatment notes "generally described short-term and long-term memory as intact or only mildly impaired" and "consistently described the [Plaintiff] as fully oriented and cooperative with logical thoughts, average or good insight and judgment, and average intelligence." *Id.*

24

Plaintiff was also seen by Marc D. Carpenter, a psychologist who conducted consultative examinations on November 3, 2017, and April 23, 2018, but the ALJ did not assign these any weight because Mr. Carpenter did not assess any work-related limitations. At her first consultation with him, Plaintiff scored twenty-seven out of thirty on a Mini Mental Status Examination ("MMSE") and presented as "cooperative and socially appropriate." *Id.* at 608. Noting Plaintiff's "history of abuse and trauma as both a child and an adult[,]" Mr. Carpenter diagnosed her with PTSD, persistent depressive disorder, and adjustment disorder with anxious distress. *Id.* at 608.

The ALJ noted that an RFC finding that the Plaintiff can "understand, remember and carry out simple instructions and perform simple tasks in a non-production rate setting with occasional brief interaction with the general public, interact[] with coworkers and supervisors on routine matters, and . . . adapt to routine changes" was consistent with Plaintiff's "noted ability to care for herself, seek out and comply with treatment for her multiple medical impairments, prepare simple meals, clean, wash laundry, sweep, go out alone, shop in stores, pay bills, count change, handle a savings account, and use a checkbook/money orders." *Id.* at 1942.

"An ALJ bears 'the final responsibility' for making an RFC determination, and does not necessarily need a medical opinion to do so[.]" *Dawn T. Comm'r of Soc. Sec.*, 2023 WL 3455434, at *3 (W.D.N.Y. May 15, 2023) (citation omitted); *Schillo v. Kijakazi*, 31 F.4th 64, 78 (2d. Cir. 2022) ("[T]he ALJ's RFC conclusion need not perfectly match any single medical opinion in the record, so long as it is supported by substantial evidence."). The ALJ did not err simply because her RFC findings did not align with a specific medical opinion. To the extent Plaintiff argues that the ALJ's rationale for finding Dr. Vail's opinion not fully persuasive was flawed, ALJ Sutker was entitled to find Dr. Vail's and Ms. Sheriff's opinions inconsistent with Plaintiff's performance on mental status examinations, her lack of distress or minimal distress at numerous appointments, and her reported activities of daily living. *See Smith v. Comm'r of Soc. Sec.*, 351 F. Supp. 3d 270, 282 (W.D.N.Y. 2018) (finding no error where ALJ assigned provider's opinion only "some weight" because "her opinion was inconsistent

with her benign findings on most of her mental status examinations") (internal quotation marks omitted); *Timothy J. v. Comm'r of Soc. Sec.*, 583 F. Supp. 3d 419, 426 (W.D.N.Y. 2022) (concluding ALJ did not err by "not[ing] that [p]laintiff's reported daily activities were inconsistent with the extreme limitations identified in some of the medical source opinions of record").

The ALJ's RFC adopts some of the limitations in Dr. Vail's opinion by limiting Plaintiff to simple instructions and simple tasks; occasional, brief interaction with the general public; and interaction with coworkers and supervisors on only "routine matters." (Doc. 5-1 at 1934.) Because "the ALJ was free to base her RFC findings on the portions of the various medical opinions that she found persuasive, along with the other evidence of record[,]" and because the ALJ provided valid reasons for rejecting the more extreme limitations assessed by Dr. Vail and Ms. Sheriff, she did not err in evaluating Plaintiff's psychological impairments. *Kimberly H. v. Comm'r of Soc. Sec.*, 671 F. Supp. 3d 328, 334 (W.D.N.Y. 2023).

## E.   Whether the ALJ Substituted Her Own Judgment for Medical Evidence and Failed to Consider Plaintiff's Obesity.

Plaintiff argues that because the ALJ did not find any of the medical opinions in the record fully persuasive, the RFC lacks a supporting opinion and demonstrates that ALJ Sutker substituted her own opinions for medical opinions. She further argues that the ALJ erred by failing to consider the combined effects of obesity with her other impairments.

The Second Circuit does not require an RFC to correspond with a single medical opinion. *See Schillo*, 31 F.4th at 78; *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in h[er] decision, [s]he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."). Because the ALJ adequately explained her reasons for rejecting the portions of medical opinions that support a more restrictive RFC and otherwise accounted for limitations that she found to be supportable and consistent with the record, her RFC

26

determination was supported by substantial evidence. *See Kimberly H.*, 671 F. Supp. 3d at 334, 337 (upholding RFC finding where ALJ "adequately explained the reasons for her assessment of [medical] opinions, including considering supportability and consistency[,]" even though ALJ did not "accord controlling weight to any particular medical opinion"); *see also Sarah S.*, 2022 WL 913095, at *4 (finding that "ALJ did not base the RFC on an impermissible interpretation of bare medical findings because she did not wholly reject all medical opinions of record").[6]

Contrary to Plaintiff's argument, ALJ Sutker did not fail to mention obesity in the RFC analysis. She specifically acknowledged that "[Plaintiff's] obesity likely aggravated her symptoms, particularly with respect to her musculoskeletal pain" but found "no evidence that it resulted in any subjective symptoms, objective signs[,] or work-related limitations other than those already described." (Doc. 5-1 at 1940.) Plaintiff has the "duty to prove a more restrictive RFC," and she has not identified additional limitations attributable to her obesity. *Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) (summary order); *see also Campbell v. Astrue*, 713 F. Supp. 2d 129, 142 (N.D.N.Y. 2010) (finding "adequate evidence that the ALJ considered [p]laintiff's obesity" where ALJ found obesity to be a severe impairment, stated that he considered plaintiff's obesity in combination with other impairments, and included physical limitations in the RFC).

Because the ALJ did not commit legal error and because her determinations were supported by substantial evidence, the court must affirm even if it might reach a different conclusion. *See Brown v. Comm'r of Soc. Sec.*, 708 F. Supp. 3d 234, 242 (E.D.N.Y. 2023) (explaining that district court cannot "'substitute its own judgment for that of the [ALJ],' even if it would have justifiably reached a different conclusion") (alteration in original) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)).

---

[6] In her reply brief, Plaintiff acknowledges that the Second Circuit held in *Rubin v. O'Malley*, 116 F.4th 145 (2d Cir. 2024), that it is not categorical error for an ALJ to make an RFC finding without "a medical opinion to support her conclusions." (Doc. 13 at 7.)

## CONCLUSION

For the reasons stated above, the court DENIES Plaintiff's motion for an order reversing the decision of the Commissioner (Doc. 8) and GRANTS the Commissioner's motion to affirm (Doc. 12).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 6th day of March, 2025.

Christina Reiss, Chief Judge
United States District Court